UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                -v-

C.F., MALE JUVENILE,

                        Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: *11-22-16*

S5 15 Cr. 445 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to transfer a juvenile to enable the Government to prosecute him as an adult. On August 23, 2016, the Government filed a Superseding Juvenile Information (the "Information") against C.F.[1] Brought in conjunction with an Indictment bringing racketeering charges against 26 adult members of a Bronx gang, the Information charges C.F. with (1) conspiracy to commit racketeering, 18 U.S.C. § 1962(d); (2) assault and attempted murder in aid of racketeering, 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2; and (3) possession, use, and discharge of firearms in furtherance of those crimes of violence, 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.[2] On August 24–25, 2016, the Court presided over a hearing on the Government's motion to transfer C.F. to adult status under 18 U.S.C. § 5032.

---

[1] Pursuant to the requirements of the Juvenile Justice and Delinquency Prevention Act (the "JJDPA"), 18 U.S.C. §§ 5031–5042, all proceedings, filings, and exhibits in this case have been sealed because they pertain to allegations of juvenile delinquency. 18 U.S.C. § 5038(e). The JJDPA requires that during a juvenile delinquency proceeding, neither the name nor picture of any juvenile shall be made public. *Id.* Before publicly filing this Opinion and Order, the Court supplied a draft of it to counsel, to assure that the discussion herein does not effectively disclose C.F.'s identity. All filings and proceedings in this case have been conducted under seal.

[2] The Information superseded a Juvenile Information filed on December 9, 2015, which brought the same charges, but in less detail.

For the following reasons, the Court denies the motion to transfer C.F. to adult status.

## I.      Background

### A.      The Racketeering Charges Relating to the 18 Park Gang

The charges against C.F. were brought contemporaneously with an Indictment—returned on December 9, 2015, and superseded on September 28, 2016—against 26 adult defendants alleged to have been members or associates of a Bronx gang, known as "18 Park" or "18 Park—Young Money." *See* Indictment S6 15 Cr. 445 (PAE) (the "Superseding Indictment"). The gang is alleged to have been based in the Patterson Houses, a public housing project in the South Bronx, and to have controlled the northern portion of that project, from approximately East 143rd Street to East 148th Street, between Morris Avenue and Third Avenue.

The Superseding Indictment alleges that 18 Park's members sold retail and wholesale quantities of illegal drugs—including crack cocaine, cocaine, heroin, and marijuana—and committed acts of violence to preserve and extend the gang's authority and its drug distribution activities. These acts of violence included two murders and numerous attempted murders and assaults, largely directed at rival gangs, including gangs known as the YGz ("Young Gunnaz"), Square Gang, and the Courtland Avenue Crew. These rival gangs are alleged to have controlled adjoining areas of the Patterson Houses.

The Superseding Indictment brings charges of conspiracy to commit racketeering, 18 U.S.C. § 1962(d); narcotics conspiracy, 21 U.S.C. § 846; murder in aid of racketeering, 18 U.S.C. § 1959(a)(1); assault and attempted murder in aid of racketeering, 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5); and firearms charges, 18 U.S.C. § 924(c)(1)(A)(iii). Various defendants have pleaded guilty. On November 21, 2016, three defendants were convicted on all

charges against them, following a jury trial that began on October 31, 2016.  Trials for the

remaining defendants are scheduled to commence on February 21, 2017 and June 26, 2017.

**B.       The Juvenile Information Filed Against C.F.**

On December 9, 2015, the Government filed a Juvenile Information against C.F., S3 15

Cr. 445 (PAE), and, on August 23, 2016, a Superseding Juvenile Information, S5 15 Cr. 445

(PAE).  Its three counts arise from C.F.'s alleged participation, between 2013 and December

2015, in 18 Park, which the Information terms a racketeering and drug-trafficking organization.

Count One charges conspiracy to commit racketeering.  It alleges that C.F. committed

eight acts in furtherance.  These include, between 2013 and 2015, storing narcotics and firearms

at his residence on behalf of 18 Park; in or about fall 2013, committing, with two co-

conspirators, a shooting that targeted members of a rival gang; and, on July 29, 2015,

participating in an attempted murder in which C.F. fired shots at members of a rival gang.  Count

Two charges C.F. with assault and attempted murder in aid of racketeering, in connection with

the July 29, 2015 shooting.  Count Three charges the use, carrying, possession, and discharge of

a firearm, in connection with offenses charged in both Counts One and Two.

**C.       Procedural Background**

C.F., who was age 17 years and 10 months as of his arrest, was detained on December 9,

2015.  Since shortly after, he has been held at the Essex County Juvenile Detention Center in

New Jersey.  He is attending—by all accounts productively—Sojourn High School, a public high

school for persons charged with juvenile offenses whose cases are pending.  *See infra* pp. 28–37.

On December 15, 2015, the Government moved to transfer C.F. to adult status, and

sought a hearing on that motion, under 18 U.S.C. § 5032.  The parties' expert psychologists and

a social worker then conducted evaluations of C.F. and submitted reports.  These reports were by

Dr. Cheryl Paradis, a psychologist retained by the Government ("Paradis Rpt."); Dr. Jessica

Pearson, a psychologist retained by the defense ("Pearson Rpt."); and Lisa Orloff, a social

worker retained by the defense, who served as a mitigation expert and conducted extensive

interviews ("Orloff Rpt.").  The United States Probation Office also submitted a report, pursuant

to 18 U.S.C. § 5037(e).  The Government and defense counsel made pre-hearing submissions.

On August 24–25, 2016, the Court held an evidentiary hearing on the transfer motion.

Eight witnesses testified.  The Government called Dr. Paradis and Special Agent Candice Henry

of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who testified as to evidence of

C.F.'s criminal conduct.  The defense called Dr. Pearson; Orloff; three teachers from a middle

and high school C.F. attended, Hostos Lincoln Academy of Science ("Hostos")—Syed Hasan,

Francesca Martinelli, and Theresa Stillwell; and a social worker from the same school, Robert

Dalmau.[3]

On September 14, 2016, the Court received post-hearing memoranda from the parties.

## II.    Discussion

### A.    Applicable Law

The JJDPA, 18 U.S.C. §§ 5031–5042, provides special procedures for the prosecution of

juveniles alleged to have committed federal crimes.[4]  The JJDPA's primary purposes are "to

remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior

---

[3] "Tr." refers to the hearing transcript; "GX" and "DX" refer, respectively, to exhibits received at the hearing.

[4] A "juvenile" is defined as a person who has not attained his 18th birthday or a person who has not attained his 21st birthday if proceeded against under the statute for an alleged act of juvenile delinquency.  18 U.S.C. § 5031.

criminal conviction and to encourage treatment and rehabilitation." *United States v. Juvenile Male No. 1*, 47 F.3d 68, 71 (2d Cir. 1995) (quotation omitted).

Under the JJDPA, for a juvenile to be transferred to adult status, the Attorney General must move for such transfer and certify that there is a substantial federal interest in prosecution as an adult. 18 U.S.C. § 5032.[5]  Transfer upon a government motion is mandatory in some circumstances (*e.g.*, when a juvenile over age 16 who had previously been convicted of a state felony is charged with specified crimes). *Id.* In the circumstances here, involving a juvenile at least age 15 and charged with an act defined as a crime of violence, the Court, to transfer the juvenile to adult status, must find doing so "in the interest of justice." *Id.*[6]

Under the statute, to determine whether transfer to adult status is in "the interest of justice," the district court must consider and make findings as to the following six factors: (1) "the age and social background of the juvenile;" (2) "the nature of the alleged offense;" (3) "the extent and nature of the juvenile's prior delinquency record;" (4) "the juvenile's present intellectual development and psychological maturity;" (5) "the nature of past treatment efforts and the juvenile's response to such efforts;" and (6) "the availability of programs designed to treat the juvenile's behavioral problems." *Id.* The Court's findings as to these factors are by a preponderance of the evidence. *United States v. Doe*, 49 F.3d 859, 868 (2d Cir. 1995). The JJDPA presumes that juvenile adjudication is appropriate, unless the Government, which carries

---

[5] The Government has so certified here. *See* Information S3 15 Cr. 445 (PAE) & Exhibit A; 28 C.F.R. § 0.57.

[6] Where a juvenile is not transferred, the case proceeds under procedures set by the JJDPA, which include the holding of a juvenile delinquency hearing by the district court, with limited disclosure of the identity of the juvenile defendant and other information. *See, e.g.*, 18 U.S.C. §§ 5032, 5038. An adverse result takes the form of a finding of juvenile delinquency, not a criminal conviction. *See id.* § 5032; *United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir. 1990).

the burden of proof, establishes that prosecution as an adult is warranted.  *See United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (citing *United States v. A.R.*, 38 F.3d 699, 706 (3d Cir. 1994) ("The statute clearly intends a presumption of juvenile treatment[.]"); *Juvenile Male No. 1*, 47 F.3d at 71.

As to the six statutory factors, the Second Circuit has explained that these shed light on the juvenile's potential for rehabilitation, as "[p]ermeating the transfer decision and the six-factor inquiry is the notion of rehabilitation." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*").  In evaluating these factors, a district court "may balance the factors in any way that seems appropriate to it"; the factors need not be given equal weight.  *Nelson I*, 68 F.3d at 588.  As a broad guidepost, however, the Court is to balance "the goal of rehabilitation" against "the threat to society posed by juvenile crime."  *Nelson II*, 90 F.3d at 640 (quotation omitted); *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002).  As a result, in weighing the factors, the nature of the offense and the defendant's potential for rehabilitation "are often properly given special emphasis."  *Ramirez*, 297 F.3d at 193.  A court may give added weight to the nature of the offense when the crime at issue, such as intentional murder, is particularly serious, *see Nelson I*, 68 F.3d at 590.

The ultimate issue for the Court as to rehabilitation is whether the Government has "prove[d]" that the juvenile's rehabilitation through juvenile treatment "is *not* likely."  *Nelson II*, 90 F.3d at 641 (emphasis in original) ("While the district court may frame the analytical issues as whether rehabilitation is 'likely,' the motion to transfer may be granted only when the government proves that rehabilitation is *not* likely.").  The Court is not to shift the burden to the juvenile of proving that rehabilitation is likely.  *Id.*  At the same time, to deny a transfer motion, it is not enough for the Court to find a mere "glimmer of hope" for the juvenile.  *Nelson I*, 68

F.3d at 590 ("[A] glimmer of hope in future treatment, standing alone, would be insufficient to warrant a finding that rehabilitation is likely."). Because § 5032's ultimate command is that transfer be granted if in the interest of justice, in rare cases, transfer to adult status may be denied even where rehabilitation is not demonstrably likely. *Nelson II*, 90 F.3d at 640–41.

### B.      Assessment of the § 5032 Factors

The Court has carefully considered the six statutory factors in light of the interest of justice standard. This case presents a close question. The Government has pursued transfer to adult status, rightly emphasizing the serious nature of C.F.'s criminal acts. The defense, for its part, rightly emphasizes C.F.'s potential for rehabilitation, if liberated from his destructive home and neighborhood environment and given treatment and tutelage tailored to his needs, and notes that C.F. has made strides since his removal to a juvenile treatment facility following his arrest. On balance, the Court finds that the Government has not "prove[d]" that C.F.'s rehabilitation through juvenile treatment is "not likely," *Nelson II*, 90 F.3d at 641, that C.F. has a reasonable prospect of rehabilitation, and that transfer of C.F. to adult status is not in the interest of justice.

### 1.      C.F.'s Age and Social Background

Like the other factors, the Court assesses the juvenile's age and social background as a means of gauging the juvenile's potential for rehabilitation. *Nelson II*, 90 F.3d at 640. As to age, a court is to consider the juvenile's age both at the time of his criminal acts and at the time of the transfer hearing. *Nelson I*, 68 F.3d at 589. As to the former, a crime committed when the juvenile was "very young" or that was "an isolated indiscretion" supports transfer less, whereas conduct that occurs closer to age 18 or over a prolonged period of time supports transfer more. *See Doe*, 49 F.3d at 867. As to the latter, "current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for" a juvenile, mindful that

"the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." *Nelson I*, 68 F.3d at 589 (quotation omitted).  Alongside the juvenile's chronologic age, the Court considers his social background because the juvenile's life experience may shed light on his actual level of maturity and his capacity for growth, which ultimately informs the Court's assessment of "whether juvenile-type rehabilitation programs would be appropriate" for him. *Id.*

Although the Court ultimately makes a holistic assessment of this first § 5032 factor, it is clarifying to address distinctly C.F.'s age, at both the times of his offenses and his current age, and his social background.  The Court finds that although C.F.'s age at the time of his offenses favors transfer, his social background strongly disfavors transfer, and his current age—given the availability of long-term juvenile programs suited to his needs—also disfavors transfer.

### a.   C.F.'s age at the time of his offenses

C.F. was born February 16, 1998, and turned 18 on February 16, 2016.  As alleged in the Information, the allegations of which the Court must take as true for purposes of this proceeding, *Nelson I*, 68 F.3d at 589, C.F.'s participation in 18 Park extended from age 15 until his arrest at age 17 years and 10 months.[7]  His criminal activity was most concentrated at the back end of that period.  The three violent acts in which C.F. is alleged to have participated with 18 Park occurred from late in C.F.'s age-16 year to early in his age-17 year.  He was 16 years and 8 months on October 2, 2014, when he accompanied an 18 Park member who shot at a member of a rival gang, Information ¶ 8f; 17 years and 2 months on April 15, 2015, when he accompanied an 18 Park member when the other member stabbed and injured a member of a rival gang, *id.* ¶ 8g; and

---

[7] C.F. was age 8 in 2006, the year the Information alleges 18 Park was formed.  Information ¶ 6. The first act that the Information alleges C.F. committed in connection with the gang, however, was in 2013, when he turned 15.  *Id.* ¶ 8.

17 years and 5 months on July 29, 2015, when he fired gunshots at an associate of a rival gang, *id.* ¶ 8h.  During fall 2015, when he was age 17 and approximately eight months, C.F. was captured on intercepted phone calls interacting with Marquis Wright, leader of 18 Park's drug distribution operations, which indicated that C.F. was handling cash and illegal drugs and interacting with customers.  *See, e.g.*, GX 1C/1CT (October 22, 2015); GX 1O/1OT (November 21, 2015).  Beginning at about age 15 and 10 months and extending until his arrest, C.F. also used his residence at points as a stash house for guns and narcotics for 18 Park.  *See* Information ¶ 8a.

C.F.'s age at the time of these crimes favors transfer.  Not only did his criminal conduct extend until late into his age-17 year when it was interrupted by his arrest but his criminal conduct also escalated such that his most serious crimes were committed within a year, or 18 months at most, of his reaching majority.  *See, e.g.*, *Doe*, 49 F.3d at 867 (age favored transfer where juvenile committed robbery at age 16 and extortion at age 17; "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion"); *United States v. Juvenile Male No. 2*, 761 F. Supp. 2d 27, 33 (E.D.N.Y. 2011) (juvenile was "nearly seventeen years old, and therefore was not a young child, at the time of the alleged murders . . . weigh[s] in favor of transfer.").  On the facts alleged, C.F.'s crimes cannot be chalked up to chronologic youth.

It is no answer that C.F. committed some crimes at younger ages, such that, had he then stopped, his age as of his crimes might have disfavored transfer.  *See, e.g.*, *United States v. Juvenile Male N.R.*, 24 F. App'x 638, 639–40 (8th Cir. 2001) (where juvenile was age 16 at time he killed his stepfather with an axe, age weighed against transfer); *United States v. Juvenile*

*Male*, 844 F. Supp. 2d 333, 339 (E.D.N.Y. 2012) (juvenile's age of 16 years 3 months as of

murder weighed against transfer); *United States v. Anthony Y.*, 990 F. Supp. 1310, 1313 (D.N.M.

1998) (juvenile's age of 16 years 2 months as of two felony murders weighed against transfer).

C.F.'s pre-age-17 crimes were not isolated events:  On the contrary, after he turned 17, his

crimes continued, and escalated.  That C.F.'s crimes began at a young age thus does not afford

him any refuge as to the statutory age factor.[8]

### b.    C.F.'s social background

The parties' expert psychologists reach different conclusions as to the maturity level that

C.F.'s social background reflects.  Dr. Paradis opines that C.F.'s maturity level is "similar to

many seventeen and eighteen-year-olds," Paradis Rpt. 12; Dr. Pearson opines that C.F. has

"developmental immaturity, meaning his level of maturity is younger than his actual age."

Pearson Rpt. 13.  Having considered these opinions in light of the factual record developed as to

C.F., the Court finds Dr. Pearson's more detailed assessment, on the whole, far the more

persuasive.  In particular, the Court is persuaded that the circumstances of C.F.'s childhood and

adolescence, coupled with his severe intellectual and psychological deficits, left him lacking—to

a striking degree—the tools needed to navigate school and society productively.  These help

explain his draw to, and participation as a juvenile in, one of the gangs that dominated his

neighborhood.

To explain this assessment, the Court, first, reviews C.F.'s childhood and adolescence.

This includes his family and home circumstances and his educational and social history.  (This

---

[8] Nor can C.F.'s circumstances fairly be likened to those in which a juvenile's conduct consisted of "a smattering of low level criminality punctuated by a single violent episode when he was close to the age of majority." *A.O., a Male Juvenile*, 2016 WL 4197597, at *6.  Although C.F.'s most serious crime was the July 29, 2015 shooting, he committed multiple crimes in conjunction with 18 Park after turning 17.

background is relevant to several other § 5032 factors.)  C.F.'s innate deficiencies are important

context for this history.  C.F. has major cognitive deficits, which include an IQ that has been

measured at 70 and 78 and psychological problems.  Under any circumstances, C.F. would have

needed substantial support and treatment to cope with the challenges of school and society.  But,

as his history shows, C.F.'s journey—despite good-faith efforts to help him by educators at his

last school—has been marked more by hazards than help.  From a young age, he was exposed at

home and in his neighborhood to substance abuse, violence, threats, and other anti-social

behavior; neglected by his parents, he was largely left to face these obstacles on his own.

Consistent with the various teachers' descriptions of C.F.'s affect and behavior as regressive and

childlike, he presented to the Court, at the hearing, as a child in an adult's body.  These

circumstances all inform the Court's assessment of C.F.'s developmental maturity.  And they

frame the central question as to this factor on the transfer motion:  If C.F. were adjudicated

delinquent and housed in a behavioral treatment program in a new environment—under the

Court's authority to officially detain, for up to five years, a juvenile offender who between ages

18 and 21 has been found delinquent—would C.F. be likely to attain substantially greater

maturity and self-control?

C.F. was born to parents from Puerto Rico and raised in the South Bronx.  He is the

youngest of his mother's five children—there are two older sisters and two older brothers.  C.F.

shares the same father with one brother.  In recent years including at the time of his arrest, C.F.

lived in an apartment with his mother and one brother ("Brother-1").[9]  C.F.'s mother has worked

at various jobs, but struggled financially.  Although she received some public assistance, at times

---

[9] The Court refers to C.F.'s brothers as "Brother-1" and "Brother-2" to minimize the risk of
identifying C.F.

during C.F.'s childhood the family could not afford to pay electric bills or for necessities such as food and clothing, and faced eviction. *See* Orloff Rpt. 9; Paradis Rpt. 2; Pearson Rpt. 2–3.

For most of C.F.'s youth, his father, who is illiterate, was imprisoned, covering two stretches. Beginning when C.F. was age 3, the father was imprisoned for a year and a half. He was imprisoned again, starting when C.F. was age 7 and lasting until C.F. was age 14 (in 2012). After his release from prison in 2012, the father lived with C.F.'s family for a short time, but C.F.'s mother soon ended the relationship. *See* Paradis Rpt. 2; Pearson Rpt. 2–3; Orloff Rpt. 15.

C.F.'s mother, who largely raised C.F. as a single parent, was often absent. As young as age 7, C.F. was often left alone in the apartment; to therapists, he reported feeling neglected. C.F. spent more time on the streets than with family. Perhaps indicative of parental neglect, during his early childhood, C.F. suffered a series of physical injuries, including a burn, and several head injuries, one caused by a fall as an infant that cost him teeth, another caused by a car accident that fractured his elbow, and a third caused by a swing that left him unconscious. *See* Orloff Rpt. 8–9; Pearson Rpt. 3, 12.

C.F.'s parents abused alcohol. While living with C.F. and C.F.'s mother, C.F.'s father had a substance abuse problem. C.F.'s mother drank alcohol frequently; C.F. saw his mother drink and become intoxicated. Starting at age 16, C.F. regularly drank his mother's alcohol, which was accessible to him. C.F. drank both socially and alone, sometimes beginning in the morning, and sometimes "[u]ntil there isn't anymore," and reported episodes of vomiting, passing out, and blackouts. *See* Orloff Rpt. 11; Paradis Rpt. 2, 5–6; Pearson Rpt. 3, 12.

C.F.'s older brothers had behavioral issues. Brother-1, who at all times lived with C.F., suffers from a mental illness consistent with schizophrenia. Brother-1 once tried to hang himself. Since turning 18, Brother-1 has refused treatment for his mental health problems.

Brother-1 talks to himself, "sees things," and hears voices.  Such behavior has caused C.F. to

fear Brother-1.  C.F. locked the door to his room at night if Brother-1 was wandering around.

*See* Orloff Rpt. 6, 15; Paradis Rpt. 2; Pearson Rpt. 3.  Brother-2 frequently used marijuana,

including in the bedroom he shared with C.F. during much of C.F.'s childhood.  Now age 28,

Brother-2 was also a member of 18 Park, and has been charged with participating in the

racketeering conspiracy and with firearms offenses.  Brother-2 is alleged to have shot another

person.  *See* Paradis Rpt. 3; Indictment S6 15 Cr. 445 (PAE).

C.F.'s childhood and adolescence were punctuated by traumatic events.  When he was in

the 7th grade, a close friend was shot in the head and killed on route to a store.  C.F. had declined

to accompany the friend; after hearing gunshots, C.F. saw his friend on the ground, bleeding to

death.  C.F. felt sadness, anger, and guilt about not having accompanied his friend; he related this

story to a therapist with difficulty.  After this event, a "hit list" circulated at C.F.'s school with

his name on it, causing the school to make a "safety transfer" of C.F. to a different school,

Hostos, to reduce the risk to him of violence.  When C.F. was age 16, he was "jumped"—robbed

by youths with whom he gone to a previous school.  C.F. saw the youths running towards him

and tried to flee, but was caught and beaten up.  C.F. later stated:  "The Patterson housing project

was coming for me."  To a therapist, C.F. reported "constant fear, worry and hypervigilance

relating to 'getting jumped, stabbed, robbed.'"  C.F. reported similar fears to teachers.  Orloff

Rpt. 7–8; Paradis Rpt. 6–7; Pearson Rpt. 3–4, 7; Tr. 182–83 (Martinelli); 200 (Stillwell); 211

(Dalmau).

C.F.'s intellectual limitations were identified at a young age.  C.F. repeated first grade.

When he was age 7, a doctor recommended special education.  When he was age 7 1/2, school

records reported that C.F. had "severely delayed" cognitive abilities, including major difficulties

in all forms of expression; a teacher voiced "concern[] that [C.F.'s] academic struggles are taking

a huge toll on his self-esteem and his emotional development. . . .  He is a hardworking and

determined child, but there are times when his frustrations keep him from even wanting to

attempt to work."  When he was age 8 1/2, a speech and language evaluation found that C.F. had

deficits in memory, attention, postural control and tone, fine motor skills, visual motor skills,

writing, visual perception, and other skills affecting academic performance, and recommended

occupational therapy.  When he was age 12, records reflect that C.F. had a speech and language

disability and that he was receiving specialized services and making improvement, but, as Dr.

Pearson noted, he "was minimally motivated, distracted, distracting, with a tendency toward

hyperactivity."  When he was age 14, his reading abilities remained at a 2nd grade level, and he

had "limited comprehension of texts written at the third grade level and beyond" and was

successful only when given one-on-one attention.  When he was age 14 and two months, he

scored below the 1st percentile in a test of listening comprehension and word reading, and

manifested a speech impairment and a "depressed mood and an aversion to testing."  Both

experts tested C.F. in connection with the transfer hearing.  Dr. Pearson found that he had a "full

scale IQ" of 70, placing him in the 2nd percentile for individuals in the same age range, and at

"the low end of the [b]orderline range," with slightly higher scores for nonverbal than verbal

functioning.  C.F's word-reading score was at a 1st-grade level; his spelling score was below a

kindergarten level; and his sentence comprehension score was at 2nd-grade level.  Although she

did not test C.F.'s IQ, Dr. Paradis reported that an IQ test at an earlier, unspecified date by the

New York City Board of Education had found an IQ of 78.  Her tests found that C.F. read at

grade level 2.4 (for word reading) and grade level 1.2 (for sentence comprehension).  Dr. Paradis

also reported limits in C.F.'s "adaptive functioning," in that C.F. has not traveled far and the

most money he had ever spent was about $20 for food.  Paradis Rpt. 7–12; Pearson Rpt. 4–5, 8–10, 11; DX 15, at 3.

C.F's last school—before his arrest in this case—was Hostos; he entered in 7th grade. C.F.'s school experience was tumultuous.  Hostos is located in a crime-ridden neighborhood; students were often robbed at school of items like sneakers or phones, and at nearby St. Mary's Park, where teachers took students, needles, condoms, and broken glass lay on the ground.  At age 16, C.F. was chased down, robbed, and beaten by members of a gang.  C.F. thereafter reported fear for his safety, and, despite living within walking distance, attempted to avoid school, unless he could take a cab or be accompanied.  To his teachers, C.F. reported constant fear, including that he had been chased into the school by adults who had tried to attack him. Orloff Rpt. 7; Paradis Rpt. 4; Pearson Rpt. 4; Tr. 165–67 (Hasan); Tr. 189 (Martinelli); Tr. 199–200 (Stillwell); Tr. 213–14 (Dalmau).

C.F.'s attendance at Hostos was poor.  It trailed off from adequate in middle school to pronounced absenteeism and lateness in high school.  Teachers believed that C.F.'s fear of being attacked weighed on him and impeded his attendance and performance.  C.F.'s alcohol use also appears to have contributed to his increasing absenteeism.  Teachers and counselors at Hostos noted C.F's lack of support at home:  He often came to school, without a backpack, notebook, pen, or completed homework.  Teachers reported that C.F. knew he lagged his classmates, felt unlike them, lacked confidence, and presented as embarrassed and withdrawn.  In 10th grade, his last year at Hostos, C.F. was enrolled in English-3, Algebra-3, Earth Science-1, and United States History, among other classes.  He failed every class, except physical education and studio art.  Orloff Rpt. 14–18; Paradis Rpt. 4; Pearson Rpt. 4–8; Tr. 166 (Hasan); Tr. 183–84, 188–89, 196–97 (Martinelli); Tr. 204, 207 (Stillwell); Tr. 212–16 (Dalmau).

15

The foregoing suggests that C.F., by virtue of his social background and innate deficiencies, was quite ill-equipped to process or negotiate his challenging environment. The testimony of four of C.F.'s Hostos teachers or counselors is in accord. All four—and particularly special education teacher Stillwell and social worker Dalmau—impressed the Court as having tried conscientiously to help C.F. This testimony, by thoughtful professionals who knew C.F. long before his arrest, informed the Court's assessment of C.F.'s social background and maturity. The Court accordingly summarizes it here.

*Syed Hasan*: Hasan, at Hostos since 2003, was C.F.'s 7th grade science teacher. He testified that when C.F. arrived at Hostos, he was "below grade level" in reading and math, and "needed a lot of help." C.F had difficulty keeping up with peers, including taking notes and writing paragraphs. C.F. had little home support, and often came to school unprepared without having done homework. Hasan tried to motivate C.F., but when C.F. found classroom concepts difficult, "he would shut down" and "put his head down." On walks with Hasan, C.F. reported that certain things "shut him down. Like, when someone is screaming or yelling at him, he didn't really like that." Hasan perceived that C.F. wanted help, but there were limits to what he could receive in a mainstream public school like Hostos: "When you talk to him, he wants some kind of assistance and guidance," but "we only have him for . . . at most six hours and 20 minutes . . . then he goes back out to his neighborhood for 18 hours, 19 hours." Tr. 164–74.

*Francesca Martinelli*: Martinelli, at Hostos since 2010, was one of C.F.'s special education teachers. She testified that C.F. was at about a 2nd-grade level in all academic areas when he arrived at Hostos and had impaired fine motor, speaking and writing skills; it took C.F. 45 minutes to compose three sentences on a good day, while most peers could compose three paragraphs of writing. C.F. arrived late almost daily; upon arriving, C.F. would often "put his

head on the desk."  C.F. was suspended once for an altercation with another student but was not

a disruptive or aggressive student.  He knew he was significantly behind his peers and was

embarrassed by this.  Martinelli was protective of C.F. because he "had to deal with a lot from a

very young age."  Tr. 181–91.

*Theresa Stillwell*:  Stillwell, at Hostos 10 years, was C.F.'s English and special education

teacher.  She testified that schoolwork was difficult for C.F.; he needed one-on-one and small-

group help and for assignments to be read aloud and broken into small segments.  Stillwell

provided extra instruction for C.F.; she viewed him as trying hard and willing to listen to

teachers with whom he could relate, but very guarded.   Seeing C.F. as "a special kid" and

wanting to help him, Stillwell repeatedly urged C.F.'s mother to move C.F. out of his

neighborhood, "[f]or his safety, to get him away from bad influences, to get him more

educational support and help."  Stillwell raised the possibility that C.F. could live with her.

C.F.'s mother, however, did not accept this offer or herself relocate, for reasons Stillwell

assumed to be financial.  Stillwell viewed C.F. as badly wanting help, and needing a great deal of

it—in particular, "a supportive environment," "intensive one-on-one instruction," and emotional

support.  Tr. 198–208.

*Robert Dalmau*:  Social worker Dalmau, at Hostos for four years, first met C.F. after

C.F.'s safety transfer to Hostos.  Dalmau met individually and in group sessions with C.F.  He

perceived that C.F. had obvious academic disabilities, and low self-esteem, both as to

schoolwork and to fitting in socially.  Dalmau perceived that, with his father in prison, C.F. was

susceptible to negative social pressure from older gang members.  Dalmau viewed C.F. as "a

young man trying to find his way" amid "the dynamics of the community, all the violence, all the

drugs, and a lot of pressure that goes with that."  Dalmau saw grown men chase C.F. into the

school building; C.F. had "always constant paranoia on his mind, because people literally tried to physically assault him several times."  Dalmau viewed C.F. as having "inherit[ed]" gang affiliations and antagonists based on the block and area in which he lived and trapped in an environment marked by "ongoing feud[s]" between territorial gangs.  In Dalmau's view, given C.F.'s low self-esteem, he was particularly vulnerable to the "older people on the block. They coerce and they find people. . . .  [I]f you're a young man coming up, you fall prey to the olders, even the ones that are your 'friends' . . . they put you in dangerous situations."[10]  Dalmau testified that C.F. was not a mature young man, in part because he grew up knowing only "what's happening on his block, and that creates a reality that's false or limited;" C.F. "was never exposed to anything else to give him some kind of development."  Like Stillwell, Dalmau repeatedly—like a "theme song"—urged C.F.'s mother to move him out of the neighborhood, including allowing C.F. to live with Stillwell.  Dalmau believed C.F. needed to be "plucked up and taken off that block."  These efforts were unsuccessful.  Dalmau testified:  "In my heart of hearts, I believe we wouldn't be sitting here if [C.F. had] left" the neighborhood.  Tr. 209–19.

In light of the above, the Court finds, with Dr. Pearson, that C.F. is developmentally and socially quite immature, such that his chronologic age substantially overstates his maturity and relevant life experience.[11]  In sum, already limited by his intellectual deficits, C.F. was raised in

---

[10]  *See* Tr. 216–17 (Dalmau) ("[I]f you have low self-esteem . . . low-performing mindset necessarily, you fall prey. . . .  Next thing, you're doing things you wouldn't do on your own or your father wouldn't tell you to do, your mother, your uncle, your brother, because now you're listening to somebody else, you don't know any better.  And all you want to do is be a man.").

[11] Dr. Pearson's conclusion, which the Court finds persuasive, is that:  "Based on his cognitive limitations and history of trauma, C.F.'s developmental age was likely . . . younger than his same age peers.  Therefore, his ability to engage in good problem solving, decision making, and the assessment of future consequences was also likely less sufficient than a typical 17-year old.  It is my clinical opinion that C.F.'s present intellectual development and psychological maturity are significant less than the average 17 or 18 year old adolescent."  Pearson Rpt. 14.

a dysfunctional home and forced to negotiate a neighborhood environment which even a functional adolescent would have found daunting.  C.F.'s life experiences had not given him the basic coping and decision-making skills needed to hold local gangs at bay, including 18 Park, to which his older brother belonged and which likely gave him a form of protection from rival gangs that menaced him.[12]  Stillwell and Dalmau, who were close to C.F., persuasively explained why they viewed C.F.'s environment as a major obstacle to his maturation.  Their testimony was particularly credible, because each—long before C.F.'s arrest in this case—had acted on this belief.  Each had implored C.F.'s mother to move, or to allow him to be moved, elsewhere.

Under these circumstances, the Court finds that C.F.'s social background weighs very strongly against transfer to adult status.  It far more than offsets C.F.'s chronologic age at the time of his crimes.  As to § 5032's paramount goal of rehabilitation, C.F.'s background suggests that a significant root cause of C.F.'s juvenile crimes was environmental.  Given the overall circumstances of his adolescence and teenage years, his turn to gang affiliation was unsurprising.  Like C.F.'s Hostos teachers, the Court finds that C.F. has room to grow:  He has significant potential to attain greater maturity if relocated, for a lengthy period, from the South Bronx and into a custodial treatment program for juvenile delinquents suited to his needs.

### c.     C.F.'s present age

A juvenile's age at the time of the transfer hearing may also bear on his capacity for rehabilitation through juvenile treatment.  *See Nelson I*, 68 F.3d at 589.  C.F. is currently 18 years and 9 months old.

---

[12] The youngest of the 18 Park members arrested in this case, C.F. told the evaluating therapists that these men were his "street family"—the people who took care of him and often gave him food, alcohol, and attention when there was no one at home.  Paradis Rpt. 3; Pearson Rpt. 6, 14.

The Court's finds that, in C.F.'s case, his present age on balance slightly disfavors transfer.  On the one hand, the law generally assumes that older juveniles are more resistant to rehabilitation as a chronologic matter, and C.F. is today of adult age.  On the other hand, C.F. is still 18, not 20, *compare Nelson I*, 68 F.3d at 589, and, for the reasons stated, C.F.'s chronologic age overstates his maturation, and he has the capacity to mature if re-planted in the right environment.  Moreover, under the JJDPA, C.F.'s age leaves ample time for him to serve in mandatory treatment aimed at rehabilitation:  An offender who is between ages 18 and 21 when adjudicated a juvenile delinquent may be ordered to serve up to five years in juvenile detention.  *See* 18 U.S.C. § 5037(c)(2)(A)(i)–(ii).  For the reasons discussed *infra* in connection with the sixth § 5032 factor, the Court finds that there are suitable juvenile treatment facilities for C.F., and five years in such a program ought to be sufficiently long to enable C.F. to gain its benefits.

Weighing C.F.'s age and social background in combination, the Court therefore finds that the first § 5032 factor strongly disfavors transfer to adult status.

### 2.      The Nature of the Alleged Offenses

In contrast to the first § 5032 factor, the second factor, the nature of the alleged offenses, strongly favors C.F.'s transfer.

In considering this factor, the court must assume that the juvenile committed the offenses charged and may not evaluate the likelihood of conviction.  *Nelson I*, 68 F.3d at 589.  Courts are to give this factor added weight in cases of "particularly serious" crimes.  *See id.* at 590 (murder); *see, e.g.*, *United States v. Smith*, 178 F.3d 22, 24, 27 (1st Cir. 1999) (spree of two armed robberies and one armed carjacking, committed by menacing victims with gun and holding butcher knife against throat of victim and leading police on chase); *A.O., a Male Juvenile*, 2016 WL 4197597, at *3, *7 (assault and attempted murder, based on shooting at least

seven times into a crowd and hitting a bystander, and separate incident involving shooting of

rival gang member and two innocent bystanders); *Juvenile Male*, 844 F. Supp. 2d at 341

(murder, committed by stalking and then shooting victim in head with rifle equipped with scope).

Section 5032 also directs the Court to consider the juvenile's role in the offense:  "[T]he

court shall consider the extent to which the juvenile played a leadership role in an organization,

or otherwise influenced other persons to take part in criminal activities, involving the use or

distribution of controlled substances or firearms.  Such a factor, if found to exist, shall weigh in

favor of a transfer to adult status, but the absence of this factor shall not preclude such a

transfer."  18 U.S.C. § 5032.

The Information alleges three serious offenses: (1) racketeering conspiracy, (2) assault

and attempted murder in aid of racketeering, and (3) the use, carrying and discharge of a firearm

in aid of these offenses.  As to acts in furtherance of the racketeering conspiracy, C.F is alleged

to have to have stored drugs and guns for the gang at his residence, Information ¶8a; twice

accompanied 18 Park members when they shot at or stabbed members of rival gangs, *id.* ¶¶ 8f–g,

and twice himself to have shot at rival gang members, in fall 2013, *id.* ¶ 8c, and on July 29,

2015, *id.* ¶ 8h, an act which the Information alleges was an attempted murder.  It goes without

saying that these crimes, even without further factual amplification, are serious.  The two

shootings are particularly so, and strongly favor prosecution as an adult.

In light of the statutory command that the Court consider the juvenile's role in the

offense, the Court reviewed the evidence of these crimes, adduced at the hearing, seeking to

gauge further the severity of these crimes and whether C.F. played a leadership role in them.

This evidence included security camera video recordings capturing the July 29, 2015 shooting,

*see, e.g.*, GX 2C, 2D, 2F, 2H; wiretap recordings of C.F.'s calls with Marquis Wright regarding

the storage and sale of narcotics, *see, e.g.*, GX 1C/1CT, 1E/1ET, 1G/1GT, 1J/1JT, 1O/1OT, 1P/1PT, and excerpts of Facebook messages, reflecting C.F.'s communications with 18 Park members about drug sales or altercations with rival gangs, *see, e.g.*, GX 12, 14, 16, 20, 21.  In summary, the evidence reflected the following.

*Stash house and narcotics*: The Facebook messages and the wiretapped calls reflect that C.F.'s home was used as a stash house for drugs and firearms and that C.F. engaged in drug sales at Wright's direction.  For example, in May 2015, C.F. messaged an Omar Marroquin regarding marijuana, using coded terms for drugs.  GX 21.[13]  As decoded by Agent Henry, these messages reflected that C.F. told Marroquin that C.F. had marijuana, that Marroquin went to C.F.'s residence the next day, and that several days later Marroquin again asked C.F. if he had marijuana for sale, to which C.F. answered yes.  *Id.*; Tr. 126–27.  In other messages with a person with the Facebook username "Capii Stu," C.F. discussed guns.  GX 14, 20; Tr. 117–20.  On June 12, 2014, C.F. asked Capii Stu to bring him a gun.  GX 20; Tr. 122–23.  And, between June 15 and 17, 2014, C.F. messaged with Capii Stu to request a replacement gun because his was in New Jersey and other gangs were threatening 18 Park.  GX 14; Tr. 117–23.

As to C.F.'s phone calls with Wright, they reflect that Wright gave C.F. instructions regarding drugs.  For example, on November 21, 2015, C.F. sought answers about the amount of marijuana available and how it would be paid for.  *See* GX 1O/1OT; Tr. 110–12.  Later that day, C.F. called Wright to ask whether Wright would allow him to sell all or a portion of drugs.  GX 1P/1PT; Tr. 113–14.  C.F. asked Wright questions about how much to sell and how much money has was to give to Wright, and Wright responded.  *Id.*  On October 25, 2015, Wright called C.F.

---

[13] In these messages and on the intercepted calls, participants referred to marijuana as "loud," money as "chicken," powder cocaine as "yardie," ounces as "Os," and a $100 dollar bill as a "Ben."  Tr. 107, 110–11, 126 (Henry).

to report that someone was coming to get an amount of marijuana that Wright had stored in C.F.'s closet.  GX 1G/1GT; Tr. 109–10.  On other calls, Wright similarly instructed C.F. to do tasks and C.F. asked Wright questions.  *See* GX 1C/1CT, Tr. 108 (October 22, 2015; Wright instructs C.F. to bring drugs outside of C.F.'s residence); GX 1E/1ET, Tr. 108–09 (October 23, 2015; as interpreted by Agent Henry, Wright instructs C.F. to bring "something to the store [where 18 Park conducted drug sales] real quick."); GX 1J/1JT, Tr. 106–07 (October 9, 2015; C.F. asks Wright where he is because C.F. has money from cocaine sale but is "working on" marijuana; Wright responds, "I'm about to leave out my crib cause I had to get my hair done.").

These communications clearly reflect a pattern of drug distribution by C.F. on behalf of the gang.  At the same time, the Court's assessment is that they also reveal C.F. to be a lower-level participant and a follower, such that it would be improper to assign the second § 5032 factor extra weight on account of the juvenile's having played a leadership role.  Indeed, C.F. appears to have needed direction from Wright as to even rudimentary matters involving the drug sales; Wright directed C.F.'s actions, corrected his calculations, took over some matters himself, and, on one occasion, even notified C.F. where drugs were stashed in C.F.'s own apartment.  For example, on November 21, 2015, C.F. called Wright to report an upcoming marijuana sale.  C.F. related that "Wawa" wanted to purchase a quantity of marijuana and had given only $100 (a "Ben") to C.F., and that C.F. had yet to give Wawa the marijuana.  Finding $100 inadequate, Wright responded:  "Only a Ben?  Yeah, niggas can't take nothing, bro.  Nobody can't take nothing without money."  In response, C.F. reassured, defensively:  "He ain't take nothing, bro.  That's why I was going to call you.  That's why I told him, I said, 'No can't do nothing.'  So I call you."  Wright then told C.F. that he (Wright) will come and take the marijuana to make sure the full quantity is there.  ("I got to come . . .  You want to wait out real quick?  Cause I'm about

to come down there . . .  I'm about to take that.  I don't want nobody to take that.").  C.F. then

reassured Wright that he had not intended to give the marijuana away without Wright's approval.

("I'm not giving that until it's cool, until you get, to you say whatever.").  *See* GX 1O/1OT.

Later that day, C.F. again called Wright for direction ("I told him I'm going to call you real

quick to ask you [about quantity]"), and Wright approved the terms, *id.* ("No, no, no.  Sell it, bro.

Sell it.").  C.F. then asked Wright how much money C.F. was to give to Wright.  ("I have to give

you nine, right?"; Wright: "Yeah.").  GX 1P/1PT.  Similarly, on October 25, 2016, Wright called

C.F. to tell him someone was coming to pick up marijuana stored in C.F.'s closet which Wright

had left.  Apparently unaware of the location of this marijuana, C.F. then asked, "Where is it

at?"; to which Wright replied, "Ain't it on top of the closet?  In the closet?"  C.F. then said, "Oh,

no, no, I ain't even know that was there."  Wright then stated: "Yeah, the three [unintelligible]

that I left, he going to come get it right now."  GX 1G/1GT; Tr. 109–10.

 *Shooting incidents*:  Of the two instances in which C.F. is alleged to have shot at rival

gang members, the Court received evidence only as to the second, the July 29, 2015 shooting at

around 148th Street and College Avenue.  The Court examined the videos that capture, from

different perspectives, this incident.  They reflect that members of a rival gang had, apparently,

entered 18 Park's territory, riding bicycles and a scooter.  As they moved west on 148th Street,

C.F. and two other members of 18 Park pursued them on foot, about a half block behind.  At

approximately 11:49:10 p.m., for reasons that are unclear, C.F. fired three shots with a pistol in

the direction of the rival gang members.  At that point, the rival gang members accelerated their

pace and ran or rode away.  C.F. then fired a final shot in the general direction of the fleeing rival

gang members.  *See* GX. 2A, 2C, 2D, 2F, 2H; Tr. 137–44.

The reckless, destructive conduct reflected on these videos cannot be minimized.  C.F.'s

four gunshots could easily have taken lives, including of bystanders.  This incident alone justifies

treating the second § 5032 factor as strongly favoring C.F.'s prosecution as an adult.

That noted, there is no indication in the videos—and the Government has not alleged—

that this episode reflects a leadership role by C.F. in the gang or that C.F. organized the

participants in this episode.  Of the 18 Park posse, C.F. alone fired gunshots, but the video does

not shed light on why he came to do so.  The extra weight warranted for this § 5032 factor in

cases of a juvenile who was a gang leader thus does not apply here.

### 3.     The extent and nature of the juvenile's prior delinquency record

C.F. has never been adjudicated delinquent.  GX 8.  This case thus contrasts with those in

which the juvenile committed the crime at issue after having been adjudicated delinquent.  In

such cases, courts have viewed the juvenile's record as reflecting durable criminality and

recidivism and a low likelihood of rehabilitation.  *See, e.g.*, *Juvenile Male No. 2*, 761 F. Supp.

2d. at 39–40.  In this respect, this factor disfavors C.F.'s transfer.

C.F. was arrested, however, twice before his arrest in this case.  On March 24, 2015, he

was arrested and charged with an assault in the area of the Patterson Houses.  *See* GX 10.  And

on August 11, 2015, he was charged with two counts of criminal possession of a weapon and two

counts of reckless endangerment, both in connection with the July 29, 2015 shooting incident.

*See* GX 9.  Following C.F.'s arrest in this case, these charges were all dismissed.

There is a split of authority whether a juvenile's prior arrests may be considered under

this § 5032 factor.  *Compare United States v. Juvenile LWO*, 160 F.3d 1179, 1183–84 (8th Cir.

1998) (holding that this factor permits consideration only of convictions, not arrests) *with United*

*States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998) (holding courts may consider arrests as to this

factor).  The Second Circuit has arguably implied that such arrests may be considered under this

factor, *see Doe*, 49 F.3d at 868 (noting, without criticism, that the district court had done so), but

has not expressly addressed this issue.

The Court here need not resolve this doctrinal technicality.  Regardless whether a

juvenile's prior arrests may be considered under *this* § 5032 factor, they may be considered

under others, because the juvenile's responses to such an event may, in appropriate cases, bear

on the juvenile's rehabilitative potential and potentially social background, if not other factors.

*See Juvenile LWO*, 160 F.3d at 1183–84; *United States v. Anthony Y.*, 172 F.3d 1249, 1253–54

(10th Cir. 1999) (non-adjudicated charges may be considered under other factors, because

"'plain language of those terms is broad enough to authorize the admission of evidence regarding

almost any action, criminal or otherwise, the juvenile has taken,' as long as it is relevant."

(quoting *Juvenile LWO*, 160 F.3d at 1183)).

For simplicity's sake, the Court considers C.F.'s prior arrests at this point.

The Court's judgment is that C.F.'s prior arrests weigh in favor of transfer, such that they

effectively offset his lack of any adjudications of delinquency, and render this factor, on balance,

neutral.  Particularly concerning is the fact of the March 24, 2015 arrest, C.F.'s first.  The Court

does not consider the alleged conduct underlying that arrest, because the charge against C.F.—

which appears to have related to a fight with a member of a rival gang, the YGz, *see* GX 4, 12—

was dismissed and forms no part of the charges in this case.  But it is relevant that C.F., after that

arrest, committed the July 29, 2015 shooting and the narcotics trafficking with Wright.  The

Government fairly notes that C.F.'s arrest—his first brush with the criminal justice system—did

not deter him from further crimes.  Given that, it argues, immersion in juvenile treatment may

also fail to modify C.F.'s behavior.  Undeniably, there is force to that argument.  However, an

arrest is different from juvenile behavioral treatment.  An arrest does not attempt to modify a

juvenile's behavior—and there is no indication that C.F. was under any supervision or

monitoring after his arrest and release.  And under the JJDPA, the paramount inquiry is whether

such treatment, if afforded to a juvenile, will likely result in rehabilitation.  C.F.'s failure to

change course after his arrests bears only so much on how he would respond to an appropriate

juvenile program.  C.F.'s arrests therefore shed only limited light on his rehabilitative capacity.

### 4.     The juvenile's present intellectual development and psychological maturity

This factor seeks to gauge, through an examination of the juvenile's present intellectual

development and his psychological maturity, the juvenile's moral culpability and his capacity for

rehabilitation.  *See Nelson I*, 68 F.3d at 589 ("the more mature a juvenile becomes, the harder it

becomes to reform the juvenile's values and behavior"); *Doe*, 49 F.3d at 868 (transfer warranted

where juvenile's above-average intelligence and repeated criminal acts made rehabilitation

unlikely); *United States v. A.R.,* 203 F.3d 955, 962 (6th Cir. 2000) (juvenile's lower intelligence

and maturity did not preclude transfer where he "ha[d] the cognitive ability to conform his

conduct to the law").  As Judge Failla has synthesized the case law:  "Courts have found that a

juvenile's present intellectual development and psychological maturity support transfer where

the juvenile is closer to average levels of intelligence and emotional or psychological maturity."

*A.O., a Male Juvenile*, 2016 WL 4197597, at *7 (citation omitted).

As to C.F., the Court has already addressed these qualities at length, in the course of

addressing the first § 5032 factor.  In brief, as to intellectual development, C.F.'s level is far

below average:  His overall IQ places him in the borderline range and his academic performance

has topped out at a third-grade level.   And, as to C.F.'s psychological maturity, C.F. is

regressive, in that his ability to make adult decisions is badly compromised.  Indeed, teachers and

others who know C.F. have widely described his bearing as simple and childlike.  *See* Orloff Rpt. 16–18 (summarizing numerous interviews).

C.F.'s comportment during the transfer hearing also suggested dysfunctionality.  The Court observed that, throughout the two-day hearing, C.F. was virtually motionless and emotionless.  During even poignant moments, including when Hostos educators needed to compose themselves while recounting their pleas to his mother to move him from the neighborhood, C.F. did not stir.  He showed no affect.  It was not clear whether the hearing's consequences meaningfully registered with C.F.

The Court's therefore finds that C.F.'s intellectual deficits and immaturity strongly disfavor transfer.

Separately, the hearing record reflects that C.F. may have other psychological conditions.  Dr. Pearson opined that C.F. exhibits many, although not all, criteria for post-traumatic stress disorder.  These, she stated, may stem from C.F.'s having witnessed his friend's murder at age 15; C.F. had difficulty speaking about the murder, and exhibited "significant symptoms of posttraumatic stress and depression including anxiety, fear, hypervigilance, nightmares, intrusive memories, and avoidance."  Pearson Rpt. 12.  Dr. Paradis and Dr. Pearson further opined that C.F.'s symptoms meet the criteria for alcohol use disorder; these including daily or near-daily drinking, drinking alone and in the morning, and blackouts, vomiting, and passing out.  Paradis Rpt. 6, 11; Pearson Rpt. 8, 11–12.  Finally, since his arrest, C.F. has exhibited symptoms of obsessive-compulsive and related disorders, including extensive pulling-out of his facial and arm hair.  Pearson Rpt. 7, 11–13.  It is reasonable to infer that productive treatment of these conditions can only enhance C.F.'s capacity for rehabilitation.

**5.      The nature of past treatment efforts and the juvenile's response to such efforts**

This § 5032 factor assesses the juvenile's past experiences with treatment, and what they reflect about whether the juvenile would likely rehabilitate through juvenile treatment.  Some courts have limited this factor to formal juvenile treatment or counseling.  Where the juvenile has not received such treatment, these courts have found the factor neutral, *see, e.g.*, *United States v. Juvenile Male,* No. 14-CR-645 (JFB), 2015 WL 6550344, at *10 (E.D.N.Y. Oct. 23, 2015), or to favor continued juvenile status, *see, e.g.*, *United States v. Leon D.M.*, 953 F. Supp. 346, 349 (D.N.M. 1996).  Others have considered a wider range of attempted correctives or interventions, formal and informal, including to social workers, therapists, school guidance counselors, and substance abuse programs.  *See, e.g.*, *United States v. Doe*, 145 F. Supp. 3d 167, 187 (E.D.N.Y. 2015); *A.O, a Male Juvenile*, 2016 WL 4197597, at *9–10.  The Court here takes this broader approach, on the premise that such experiences, failed or successful, have potential to shed light on the juvenile's capacity to rehabilitate.  *See Juvenile Male No. 1*, 47 F.3d at 71–72.

C.F. has no record of juvenile delinquency.  He thus has no record of formal treatment following an adjudication of delinquency.  In fact, before his arrest in this case, C.F., despite his various deficiencies, traumas, and behavioral issues, appears never to have had *any* assistance from any mental health professional apart from social workers at his mainstream schools.  *See* Pearson Rpt. 7, 14 ("[H]e never had formal mental health intervention or treatment in the community, and although it was recommended more than once in the IEPs [individualized education programs], he was not transferred to a special school.")

However, C.F. has experienced two other types of interventions or treatment.  The Court considers what these indicate as to C.F.'s capacity for rehabilitation.

*Counseling at Hostos*:  As noted, at Hostos, C.F. received counseling from social worker Dalmau and others.  These educators' efforts, and their genuine affection for C.F., were

impressive.  Dalmau testified that he advised C.F. not to commit crimes or sell drugs.  Tr. 222–23, 229.  As the Government fairly notes, that C.F. did not heed this sensible guidance may suggest resistance to course correction.[14]  But this is so only to a modest degree:  As Dalmau and Stillwell testified, their main message—to C.F. and his mother—was that, to progress, C.F. needed to leave the neighborhood.  For reasons the record leaves unclear, C.F.'s mother decided that C.F. would remain.  Under these circumstances, C.F.'s continued crimes and downward spiral in the face of Dalmau's wise counsel does not show non-interest in self-improvement.  On the contrary, Dalmau testified that he believes that, had C.F. been transplanted to a new neighborhood, C.F. would have positively responded.  Tr. 218–19.[15]

*Post-arrest juvenile detention*:  Since his arrest, C.F. has been held—for the first time in his life—in juvenile detention.  He is housed at the Essex County Juvenile Detention Center in New Jersey, where he attends Sojourn High School, a school for middle and high-school age youth awaiting adjudication of claims of delinquency.  He has been evaluated by a psychiatrist and is being seen by a medical social worker.  As to behavior, C.F. has not incurred any disciplinary infractions at Sojourn since his juvenile detention has begun.  He has been

---

[14] On March 29, 2013, when C.F. was 15 years 1 month old, he received similar advice—not from a professional therapist or psychologist, but from an unidentified Facebook user with the username "Chuchie Marte."  C.F. stated that he knew the potential criminal consequences of being a part of a gang but that "I can't stop it."  GX 27, at 7324.  Chuchie Marte responded:  "O I know how you could stop [it] DROP THE FUCKING GANG NIGGA."  *Id.* at 7324–25.  C.F. replied:  "I can't an I won't we not a gang we a family."  *Id.* at 7325.

[15] In a letter to the Court submitted by Orloff, C.F. indicated that he now appreciates that he must leave his neighborhood and, if necessary, his mother:  "I know itil probably be a little hard at first but I told my mom when I get out Ima stay at my grandmothers house or aunts she said ok my grandmother will take me to church an my oncle will get me a job at his simatary at lest till I finish school so I can start my dreams hopefully my mother will move by than an I be back with her."  Orloff Rpt. Ex. 5, at 7.

commended for peaceful behavior, joined the facility's church group, and responded well to the juvenile setting.  *See* Orloff Rpt. 20–21 & Ex. 16; Pearson Rpt. 7.

As to academic work, after arriving at Sojourn, C.F. was given an adult basic education test to determine the academic level that best matched his abilities.  He was placed in a 3rd-grade level class.  In his first quarter, C.F. earned 2 As (in English and United States History) and 6 Bs (in Geometry, General Science, Physical Science, Literacy, Health, and Physical Education).  In his second quarter, C.F. earned 6 As (in Art, Geometry, English, General Science, United States History, and Literacy); and 2 Bs (in Spanish and Computers).  Comment entries on C.F.'s report card state either "good class participation" or "steady progress," or both, for several classes; for no class are the entries "disruptive—poor conduct" or "inattentive/distracted" checked.  Although some of C.F.'s improved performance is likely due to the effectively mandatory nature of attendance at Sojourn, these grades and favorable comments also fairly reflect a newfound seriousness of purpose.  *See* DX 11, at 2–4; DX 16; Tr. 258 (Orloff); Tr. 289 (Pearson).

Mitigation specialist Orloff credibly testified that, based on her interviews with Sojourn personnel—including two social workers, a mental health supervisor, and a physician—C.F. is benefitting from an academic environment in which classes are smaller, structured and tailored to his needs, and classmates are at his level, *see* Tr. 259–60 ("Nobody is making fun of him.  Nobody is calling him retarded.  He can ask [a teacher] one on one for help.  He is not afraid to raise his hand anymore."), and is fitting in socially.  Tr. 262.  Dr. Pearson, who also visited Essex, similarly reported that C.F. is engaged in schoolwork, benefitting from small classes (3–4 students per class), and has not had any "behavior issues."  Dr. Pearson testified that C.F. has acknowledged his earlier alcohol abuse—he has not had access to alcohol at Essex—and is working on it with counselors.  Tr. 289, 328, 332–33.

The data from Essex and Sojourn reflecting C.F.'s behavioral and academic progress while in juvenile detention is, of course, preliminary.  On the issue of C.F.'s likelihood of rehabilitation, it is far from conclusive.  But C.F.'s progress since beginning juvenile detention is noteworthy because it has occurred under the circumstances in which the Hostos educators predicted that C.F. would advance.  They stated that C.F. needed a structured academic environment, intensive one-on-one instruction, and emotional support.  *See, e.g.*, Tr. 208 (Stillwell); Tr. 173 (Hasan).   Dr. Pearson recommended the same arrangement, plus inpatient substance abuse treatment, individual and group psychotherapy, and cognitive remediation—all of which C.F. is receiving.  Pearson Rpt. 14–15; Tr. 327–30.[16]

While C.F.'s current experience does not reveal how he would adapt if found delinquent and assigned to a long-term juvenile treatment program, C.F.'s experience at Essex and Sojourn since December 2015 is as close a proxy as exists.  On the basis of C.F.'s progress since then, and based on the Hostos educators' assessment that C.F. would respond favorably to a rehabilitative program of similar design, the Court finds that C.F.'s response to past treatment efforts strongly disfavors transfer.

### 6.    The availability of programs designed to treat the juvenile's behavioral problems

A district court need not identify a specific program that would accept a juvenile delinquent for official detention, but it must inquire into the availability of programs suitable to treat the juvenile.  *See Nelson I*, 68 F.3d at 590–91.  The Government, which bears the burden of persuasion, must do more than assert that suitable programs are unavailable.  It must show "that

---

[16] Dr. Pearson opined that C.F. is capable of "learning a trade and living a productive life." Pearson Rpt. 15.  She believes he is capable of working at a job like stocking shelves, mail delivery, housekeeping, or maintenance.  Tr. 323, 340.

it has investigated various options but is still unable to find a suitable and available program."

*Id.*  Because the burden is the Government's, "a court cannot require the defendant to locate his

own correctional facility."  *Id.* at 591.  The Court must base its determination of whether a better

likelihood of rehabilitation exists in juvenile detention or adult incarceration on a comparison

between juvenile and adult facilities.  *Id.*

Far from finding that the Government has shown the unavailability of suitable programs,

the record reflects, and the Court here finds, that juvenile detention facilities suitable for C.F. do

exist.  The Bureau of Prisons ("BOP") does not itself operate juvenile detention facilities.  But

the BOP has entered into contracts with facilities to provide for the care and confinement of

juveniles sentenced under the JJDPA.  In this case, a knowledgeable BOP administrator, Peter

Brustman, has attested that among these are contracts with two such facilities—a governmental

facility in South Dakota and a private facility in Texas—that are secure so as to be suitable for

juveniles found delinquent based on violent offenses.  *See* GX 11, ¶¶ 5–6 (affidavit of Peter

Brustman) ("Brustman Aff.").[17]

Moreover, Brustman attests, to secure a contract with the BOP, a contractor must have

met a series of requirements regarding its programs.  Among the requirements relevant to C.F.'s

needs are that: (1) Each federal juvenile in custody receive at least 50 hours of formal quality

---

[17] Brustman is Assistant Administrator for Operations for the Residential Reentry Management
Branch ("RRMB") of the BOP's Reentry Services Division.  As such, he oversees the BOP staff
responsible for oversight of contract procurement functions within RRMB relating to residential
reentry and juvenile residential services contracting.  In his prior role, between February 2015
and April 2016, Brustman oversaw BOP staff responsible for contract administration related to
residential reentry and juvenile facilities nationwide.  Brustman Aff. ¶¶ 1–2.  Brustman attests
that 70–75% of federal juveniles committed to the BOP's custody were adjudicated based on a
violent offense; that 9% were adjudicated based on drug-related offenses; and that of the 64
juveniles (61 males, 3 females) currently housed by the BOP, 41 are housed in a secure facility.
*Id.* ¶ 7.

programming per week, including, as needed, programs relating to literacy, *id.* ¶ 9; (2) the facility's formal programs be "meaningful, measurable, and responsive to the educational, cultural, emotional, physical and spiritual needs" of the population, *id.* ¶ 10; (3) the facility develop an individual program plan ("IPP") for each juvenile, *id.* ¶ 10–11; (4) each juvenile receive a minimum of four hours of school per weekday at the appropriate level, whether it be elementary, secondary, or more advanced, *id.* ¶ 12; (5) the facility supply vocational training, *id.* ¶ 14; and (6) the facility provide an "independent living preparation" course as a supplement to the juvenile's formal education, which must include modules on gang awareness, crime victim awareness, and cognitive skills, *id.* ¶ 15.

Significant in light of C.F.'s particular needs, the contractor is required to provide, to all juveniles, a minimum of 30 hours of substance abuse education, *id.* ¶ 16, and, to juveniles found to need it, chemical dependency treatment, which must include weekly group and individualized counseling by therapists who are certified addiction counselors, *id.* ¶ 17. The contractor must also provide counseling and psychological services consistent with the needs of each juvenile, based on assessment and a clinical diagnosis; the juvenile's IPP should address treatment needs, including for emotional disturbance and mental illness. *Id.* ¶ 18. Assessments of the juvenile must be conducted within two weeks of arrival and must address the needs of juveniles with histories of learning disability, substance abuse, mental illness and retardation, emotional disturbance, violence, and gang involvement. *Id.* ¶¶ 24–25.

On the basis of this account by the BOP, these two facilities, at a minimum, are available to C.F. and suited for his needs.[18] The Government, in fact, so concedes. Gov. Br. 27. The

---

[18] Based on Orloff's research, the defense argues that other juvenile detention facilities, including state facilities closer to New York, are qualified to tend to C.F.'s needs. Def. Br. 19. That may prove so, but absent vetting by and a contract with BOP, the Court cannot assume that

Government's argument is instead that the BOP's secure facilities for adults—*i.e.*, the BOP prisons which house adults members of violent gangs—contain similar programming (*e.g.*, educational, vocational, psychotherapeutic, and substance abuse programs).  *Id.* at 27–30.  On this basis, the Government argues, the sixth § 5032 factor is in equipoise, and weighs neither for nor against transfer.

The Court finds otherwise.  Without diminishing the good-faith efforts that the BOP's personnel at its adult facilities would surely make to treat C.F., the Government has not shown that the programs at these facilities for juveniles are equal, let alone superior, to those at the facilities with which it contracts that are dedicated specifically to the needs of juveniles.  And even assuming comparable programming, the Government has not represented that, if housed at a federal prison, C.F. would be kept separate from adult offenders.  C.F.'s recent experience at the juvenile facility in New Jersey is strong evidence that—as his Hostos teachers had predicted—his rehabilitation depends on removing him from negative adult and environmental influences.  The Court's firm conclusion is that C.F. is more likely to rehabilitate if housed in a treatment facility far afield—in terms of population and geography—from the terrain in which his gang activity occurred.  The Court is skeptical that, if housed in an adult facility and daily

---

such facilities are available to C.F.  The Court separately notes that in the recent (August 2016) decision in *A.O., a Male Juvenile*, Judge Failla identified juvenile facilities nearer to New York that—had transfer to adult status not been warranted—would have been suitable for that federal defendant, who like C.F. was alleged to have been a violent member of a Bronx gang.  *See* 2016 WL 4197597, at *11 ("Although there are no such facilities in New York State, there are facilities where A.O. could be housed in Maine and the District of Columbia, as well as other similar facilities in other areas of the United States."); *cf. Juvenile Male*, 844 F. Supp. 2d at 347 (noting "some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant").  The present record does not permit the Court to assess whether these nearer facilities are available to or suitable for C.F.  The Court's ruling denying transfer assumes *arguendo* that they are not.  The Court, however, expects the BOP—in the event C.F. is found delinquent and the BOP is called upon to place C.F. in a juvenile facility—to explore carefully whether suitable placement options closer to New York are available.

encountering hardened and violent offenders in their 20s, 30s, and beyond, C.F. will mature and develop productive life skills.

The Court therefore finds that the sixth § 5032 factor here strongly disfavors C.F.'s transfer.  C.F.'s ability to rehabilitate will be significantly enhanced by immersion in a juvenile treatment facility like the one in which he is presently situated.

## CONCLUSION

Since the transfer hearing, the Court has given focused attention to the § 5032 factors. Considered in isolation, four of these factors strongly favor juvenile treatment, one strongly favors transfer to adult status, and a sixth is neutral.  That tabulation is misleading, however, because the single most important individual factor (the nature of the offenses charged) favors transfer, and because, as the foregoing discussion reflects, the four factors that favor juvenile treatment materially overlap.  Viewing the factors in combination, this is a close case, on which reasonable minds may differ.

In the end, the Court's judgment, viewing the six factors together, is that the interests of justice do not favor transfer to adult prosecution.  The Government has not proven, as it must to attain transfer, "that [C.F.'s] rehabilitation is *not* likely."  *Nelson II*, 90 F.3d at 641 (emphasis in original).  Rather, the assembled record supports that C.F. is a work in progress.  Saddled with severe intellectual deficits and psychological issues, raised in a toxic home and housing-project environment in which his parents neglected him and modeled destructive habits, and personally threatened by gang violence and lacking protection, C.F. lacked the social maturity and practical coping skills to ward off the allure of his older brother's gang.  But in the past 10 months, since placed in an out-of-state juvenile facility following his arrest, C.F. has made significant strides, behaviorally and academically, seemingly vindicating his Hostos teachers' view that, if removed

36

from the South Bronx and given structured support and guidance, he would rehabilitate. While the Court cannot predict the future, the Court can—and does—find that C.F. has a reasonable prospect for rehabilitation if removed from his home environment and treated, over a sustained period, in a juvenile facility. The evidence does not show that this outcome is unlikely.

The Court accordingly denies the Government's motion to transfer. An order as to next steps in this matter will issue shortly.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 22, 2016
       New York, New York

*Counsel of Record:*

Dina McLeod, Esq.
James McDonald, Esq.
Max Nicholas, Esq.
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, N.Y. 10007
*Counsel for the United States of America*

John F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, N.Y. 10007
*Counsel for defendant C.F.*

Jennifer R. Louis-Jeune, Esq.
Law Office of Jennifer Louis-Jeune
733 3rd Avenue, Suite 1567
New York, N.Y. 10017
*Counsel for defendant C.F.*